**MELLON BANK, N.A., and Robert B. Reed, Jr., Executor of the Estate of A. Leon Davis, a/k/a Austin L. Davis, Deceased, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 82–1939.**

United States District Court, W.D. Pennsylvania.

June 26, 1984.

John Meck, Pittsburgh, Pa., for plaintiffs.

Will E. McLeod, Tax Div., U.S. Dept. of Justice, Washington, D.C., Thomas A. Daley, Asst. U.S. Atty., Pittsburgh, Pa., for defendant.

### MEMORANDUM

McCUNE, District Judge.

The issue before us on cross motions for summary judgment is whether or not the Verona Cemetery, a non-profit corporation, is a "corporation organized and operated exclusively for ... charitable ... purposes," under § 2055(a)(2) of the Internal Revenue Code of 1954, as amended.

The plaintiffs have exhausted their administrative remedies. We have jurisdiction pursuant to 28 U.S.C. § 1346.

### *Facts*

The following facts have been stipulated to by the parties and are therefore not in dispute.

*History of the Case*

A. Leon Davis died testate on December 6, 1976. His last Will dated October 11,

1972, and a Codicil dated November 21, 1975, provided as follows:

> All of the rest, residue and remainder of my estate I give, devise and bequeath to THE VERONA CEMETERY, Oakmont, Pennsylvania, with the sum of Thirty Thousand Dollars ($30,000.00) thereof to be applied toward the erection of a new utility building and the balance thereof to be added to its Endowment Fund.

On August 22, 1977, the plaintiffs timely filed a federal estate tax return for the Estate of A. Leon Davis and paid taxes owed in the amount of $96,808.16. A deficiency in the amount of $860.32 was subsequently paid on June 19, 1979.

On September 11, 1979, the plaintiffs filed a claim for a refund in the amount of $97,557.15, plus interest, based on a claim for a charitable deduction of $370,901.74. The Internal Revenue Service disallowed the charitable deduction in full and denied the claim for a refund.

The plaintiffs then filed the instant suit claiming that the denial of the deduction was improper and that the resulting Federal Estate Tax was erroneously assessed and collected.

Before addressing the merits of the plaintiffs' claim we will briefly review the history and physical characteristics of the Verona Cemetery based upon the stipulation.

*History of the Verona Cemetery*

In 1881, residents of the Borough of Verona and several other communities drafted Articles of Association for a public cemetery. The Association's stated purpose was the maintenance, without profit, of a public cemetery for the burial of the dead, without distinction or regard to sect.

Thereafter, the Court of Common Pleas of Allegheny County was petitioned by the Association's subscribers requesting that a corporation of the first class (non-profit) be established. A decree was entered on January 3, 1882, granting the Charter. The Charter and the rules and regulations have remained unchanged and are still in full force and effect.

The corporation was organized on a non-stock basis and none of the assets and no part of the net earnings of the cemetery have or may inure to the benefit of any private individual, corporation or lot owner. Persons of different races and religions have been buried in the cemetery without any restrictions or distinction whatsoever. The cemetery is operated by a Board of Managers who serve without compensation.

*Description of the Cemetery*

The cemetery itself occupies approximately 8.5 acres with approximately 8,490 burial plots, all of which have been or soon will be sold.

In the middle of the cemetery there is a circular grass plot where there is erected a flagpole and a monument to the local Civil War dead. On the outside of the circle is a platform erected by the Grand Army of the Republic. Upkeep of these monuments has been performed by employees of the Verona Cemetery without charge.

Annual community Memorial Day services are held each year from the platform. The community regards the Verona Cemetery as publicly owned.

There is also a building located on the grounds which contains a chapel, office and storage rooms. The chapel is used without charge by all religious denominations for funeral services. Prior to the erection of the chapel, the estates or families of decedents had to arrange at their own expense for the rental and erection of a temporary tent to provide shelter for such services.

It is not known whether the cemetery ever provided free, or at a reduced rate, cemetery lots or grave openings to indigents. The cemetery has had no established practice which either authorized or denied such free or reduced rate service to indigents, nor has it ever been requested to provide such services. On several occasions the cemetery has provided grave openings and subsequently has not been

paid for this service, allegedly because of lack of funds.

*Existing Tax Exemptions*

Since July of 1941, the cemetery has been exempt from federal income taxes. The cemetery is also exempt from county and local real estate taxes. There is no realty transfer tax imposed on the sale of grave sites by the cemetery or in a later resale by a private owner. In 1979, the cemetery received a tax exemption for state sales tax. Finally, on November 18, 1982, Administrative Judge Zavarella of the Orphan's Court Division of the Court of Common Pleas of Allegheny County held that the bequest here in dispute was exempt from Pennsylvania Inheritance Tax under § 62 of the Pennsylvania Inheritance Tax Act because the Verona Cemetery was charitable.

*Revenue of the Cemetery*

The cemetery receives revenue from the following sources:

a) the sale of grave sites;

b) grave openings;

c) an endowment charge of $150.00 per grave site for deposit in the Endowment Fund;

d) annual mowing charges for grave sites on which no endowment charge was imposed at the time of sale;

e) charges for headstone foundations;

f) two privately established trusts which generate approximately $400.00 a year;

g) a small charge for burial of cremation ashes; and

h) a $10.00 deed and endowment charge where a lot owner conveys directly to a 3rd party.

*Merits of Plaintiffs' Claim*

While cognizant that the issue before us is not one of first impression and that the weight of authority as expressed in prior tax court and reviewing court decisions favors the defendant's position, we believe that the issue warrants reevaluation in light of the United States Supreme Court opinion in *Bob Jones University v. United States*, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983).

In *Bob Jones University*, the Supreme Court addressed the issue whether the university was entitled to a tax exemption under § 501(c)(3) of the Internal Revenue Code as a "corporation ... organized and operated for religious, charitable ... or educational purposes." The language of 501(c)(3) (defining charitable, religious and educational organizations exempt from income tax) is similar to that of § 170 (defining organizations, contributions to which may be deducted for income tax purposes) and § 2055(a)(2)[1] of the Code.

Recognizing the similarity between §§ 170 and 501(c)(3) the Court in *Bob Jones University* observed that since the two sections are closely related (both encourage the development of certain organizations through the grant of tax benefits) and since the language of the sections are in most respects identical, the Commissioner and the courts have applied many of the same standards in interpreting those sections.

The Court concluded that to the extent one section aids in ascertaining the meaning of the other, it is entitled to great weight. *Bob Jones University, supra*, 103

---

**1.** § 2055. Transfers for public, charitable, and religious uses.

(a) In general. For purposes of tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate the amount of all bequests, legacies, devises, or transfers—

(2) to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art, or to foster national or international amateur sports

competition (but only if no part of its activities involve the provision of athletic facilities or equipment), and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual, which is not disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office; ...

S.Ct. at 2026 n. 10, citing *United States v. Stewart,* 311 U.S. 60, 64–65, 61 S.Ct. 102, 105–106, 85 L.Ed. 40 (1940).

As applied to this case, the Court's discussion of the term "charitable" in the context of § 501(c)(3) is entitled to "great weight" in interpreting the nearly identical language of § 2055(a)(2).[2]

In *Bob Jones University* the Supreme Court opined that congress, in enacting § 170 and § 501(c)(3), "sought to provide tax benefits to charitable organizations, to encourage the development of private institutions that serve a useful public purpose or supplement or take the place of public institutions of the same kind." *Bob Jones University, supra,* 103 S.Ct. at 2026.

"Tax exemptions for certain institutions thought beneficial to the social order of the country as a whole, or to a particular community are deeply rooted in our history… The origins of such exemptions lie in the special privileges that have long been extended to charitable trusts." *Id.*

The Court further stated that when analyzing § 501(c)(3) within the framework of the Internal Revenue Code, the background of Congressional purposes "reveals unmistakable evidence that, underlying all relevant parts of the Code, is the intent that entitlement to tax exemptions depends on meeting certain common law standards of charity—namely, that an institution seeking tax-exempt status must serve a public purpose and not be contrary to established public policy." *Id.*

Since the Congressional purposes underlying charitable exemptions are the same as those underlying the Code sections dealing with charitable deductions (encouragement of certain institutions through tax benefits) it follows that institutions under those sections dealing with charitable deductions must also meet common law standards of charity.

We thus turn to the common law and law of charitable trusts to determine whether a public non-profit cemetery is a corporation organized and operated exclusively for charitable purposes.

It has long been followed that a charitable use "may be applied to almost anything that tends to promote the well-being of social man." *Ould v. Washington Hospital for Foundlings,* 95 U.S. 303, 311, 24 L.Ed. 450 (1878).

Lord MacNaghten, in a restatement of the English law of charity, long recognized as a leading authority in this country stated:

> Charity in its legal sense comprises four principal divisions: trusts for the relief of poverty: trusts for the advancement of education: trusts for the advancement of religion: and *trusts for other purposes beneficial to the community, not falling under any of the preceding heads.*

*Commissioners v. Pemsel* [1891] A.C. 531, 583 (emphasis added). It is especially noteworthy that this "public benefit" element of charity was recognized in the estate tax area. In footnote 15 of its opinion in *Bob Jones University,* the Court points out that in 1924 the Solicitor of Internal Revenue looked to the common law of charitable trusts in construing § 403(a)(3) of the Revenue Act of 1918. That section is a predecessor to § 2055(a)(2) and contains similar language. The Solicitor's view of the charitable deduction section was that "generally bequests *for the benefit and advantage of the general public are valid as charities.* Sol.Op. 159, III–1 C.B. 480 (1924). (Emphasis added).

The plaintiffs' view, therefore, that the Verona Cemetery, a public non-profit cemetery, is "charitable" under § 2055(a)(2) because it provides a benefit to the general public, is not without precedent.

This view is in stark contrast to prior court decisions wherein courts have consistently equated "charitable" solely with the relief of poverty. *See, e.g., Wilber National Bank of Oneonta v. Commis-*

---

**2.** As all statutory sections are subject to the same definition of "charitable," treasury regulations promulgated under § 501(c)(3) and § 170 which address the definition of "charitable" are also relevant to the definition of "charitable" under § 2055(a)(2).

*sioner of Internal Revenue,* 17 B.T.A. 654 (1929) (poor not given lots or grave sites so not for charitable purposes), *Gund's Estate v. Commissioner of Internal Revenue,* 113 F.2d 61 (6th Cir.1940) (no free burial space was ever provided nor less than fair value ever charged for burial or upkeep), *Bank of Carthage v. United States,* 304 F.Supp. 77 (W.D.Mo.1969) (not a charitable organization since cemetery charged for the lots, treated rich and poor alike and did not provide free burial space for the poor), *Child v. United States,* 540 F.2d 579 (2d Cir.1976) (cemetery did not make a practice of providing free burial services to indigents), *First National Bank of Omaha v. United States,* 681 F.2d 534 (8th Cir.1982) (perpetual care trust fund would not benefit the poor).

We believe this view of what is "charitable" is much too narrow and is also inconsistent with the principle of charitable trust law that the definition of "charity" depends upon contemporary standards. *See,* e.g., RESTATEMENT (SECOND) OF TRUSTS, § 374, comment a (1959); G. BOGERT & BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 369, at 65–67 (rev. 2d ed. 1977); IV A. SCOTT, THE LAW OF TRUSTS § 368, at 2855–2856 (3d ed. 1967).

We think a much more contemporary view of "charity" considers the benefit to the community as a whole. The maintenance of cemetery facilities by cemetery associations benefits the community both through its aesthetic effects and by the performance of a necessary social task. *Child, supra,* (Anderson, J., dissenting).

Furthermore, were it not for public nonprofit cemetery associations, responsibility for burial of the dead "would descend upon the public," i.e., on local municipalities. *Dulles v. Johnson,* 273 F.2d 362, 366 (2d Cir.1959) *cert. denied,* 364 U.S. 834, 81 S.Ct. 54, 5 L.Ed.2d 60 (1960). The upkeep of the cemetery would also ultimately become the responsibility of the local government. It is anticipated the Verona Ceme-

tery endowment fund will carry the cemetery for approximately twenty years. Afterwards, public contributions or municipal assumption of the operating costs will be necessary to continue the cemetery's operation.[3]

Thus to the extent that the cemetery is funded to avoid neglect and possible borough intervention the burdens of government are lessened. Treasury regulations which define "charitable" for purposes of § 501(c)(3) expressly recognize that activities "lessening the burden of government" may bring an organization within that definition. U.S.Treas.Regs. § 1.501(c)(3)–1(d)(2).

Additionally,

"Appropriate burial and care of the remains of deceased persons are important as a matter of sanitation. Marked graves, with data as to the date of birth and death and ancestry, frequently constitute valuable aids to the courts and other agencies of government in disposing of the rights of the living."

BOGERT, TRUSTS AND TRUSTEES § 377 p. 1197.

Contrary to the view that the only persons who benefit from gifts to the cemetery are lot owners is the fact that the community regards the cemetery as publicly owned. Yearly Memorial Day services performed at the cemetery encourage both patriotism and a feeling of community. *See* RESTATEMENT (SECOND) OF TRUSTS, § 374 comments e & f.

The numerous tax benefits already enjoyed by the Verona Cemetery are also indicative of official encouragement and recognition of the beneficial nature of nonprofit public cemeteries. (*See* discussion under *Existing tax exemptions, supra.*).

A corollary to the public benefit principle is the requirement that the purpose of the charitable organization not be illegal or violate public policy. *Bob Jones University,* 103 S.Ct. at 2028. As stipulated, the Vero-

---

**3.** § 47804 of the Borough Code provides for maintenance of neglected cemeteries. PA.STAT. ANN. tit. 53, § 47804 (Purdon 1966).

na Cemetery is open to anyone without regard to race or religion. The cemetery is not operated for profit and no part of the net earnings inure to the benefit of any private individual.

We therefore reach the inevitable conclusion that contemporary society considers public non-profit cemeteries as charitable organizations because of the important social function they perform and the concurrent lessening of the burden of the public fisc.

Finally we address and reject the argument that since Congress specifically referred to cemetery companies under § 170(c)(5) and 501(c)(13) but did not provide the same specific reference under § 2055(a), that this was an express indication of Congressional intent not to consider cemeteries as charitable under § 2055(a).

Clearly the intent of § 170(c)(5) and § 501(c)(13) was to encourage the organization of non-profit cemeteries through the grant of tax benefits to the cemetery companies and their contributors. It is quite a contradiction to encourage gifts under § 170 but discourage bequests by denying an estate tax deduction under § 2055(a)(2). Whether the contribution is a gift given during one's lifetime or a bequest after one's death should be irrelevant. The desirable end result is the encouragement of gifts to non-profit cemeteries and the resultant benefit to the community.

We therefore conclude that the Verona Cemetery is a corporation organized and operated exclusively for charitable purposes under § 2055(a)(2), and that the Estate of A. Leon Davis is entitled to a charitable deduction for the bequest.