COLUMBIA PARK AND RECREATION ASSOCIATION, INC.,
PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 19537-84X.　　　Filed January 6, 1987.

*Julie Noel Gilbert*, for the petitioner.
*George J. Blaine*, for the respondent.

GERBER, *Judge*: This is an action for declaratory judgment pursuant to section 7428.[1]

By a final adverse ruling dated March 21, 1984, respondent determined that petitioner is neither organized nor operated exclusively for exempt purposes within the meaning of section 501(c)(3). Petitioner invokes the jurisdiction of this Court and challenges respondent's adverse determination,[2] seeking a declaratory judgment.[3]

The issue for our consideration is whether petitioner, a section 501(c)(4) organization, qualifies as a section 501(c)(3) charitable organization. This case was submitted fully stipulated pursuant to Rule 122.[4] Our decision is based upon the stipulated administrative record, as defined in Rule 210(b)(11), which is accepted as true for purposes of this proceeding and is incorporated herein by reference.

---

[1] All statutory references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue, unless otherwise indicated.

[2] Sec. 7428(a) authorizes this Court to make a declaration as to the correctness of a final determination by respondent that a corporation is not an organization described in sec. 501(c)(3).

[3] Declaratory judgment prerequisites have been satisfied in this case: Petitioner is the organization whose qualification is at issue, sec. 7428(b)(1); petitioner exhausted its administrative remedies, sec. 7428(b)(2); and petitioner filed its petition before the 91st day after respondent mailed his determination, sec. 7428(b)(3). See also Rule 210(c), Tax Court Rules of Practice and Procedure.

[4] All Rule references are to the Tax Court Rules of Practice and Procedure.

OPINION

## General Background

Columbia Park & Recreation Association, Inc. (petitioner or association), was incorporated as a nonprofit organization under the laws of the State of Maryland on December 10, 1965. At the time its petition was filed, petitioner was located (had its "principal place of business") in Columbia, Maryland. Petitioner was created by the developers of Columbia, Howard Research & Development Corp. (the Development Corp.),[5] as an integral part of Columbia.

Columbia (Columbia or the development) is a large, private development of residential, commercial, and industrial real property located in Howard County, Maryland.[6] Columbia is an unincorporated part of Howard County and is not a political subdivision. The residents of Columbia look to Howard County as the lowest level of public governmental authority. The development covers 14,600 acres with a projected "full occupancy" population of approximately 110,000. Conceived as an experiment in city planning, Columbia is comprised of a number of residential villages which are designed to provide housing opportunities for high, moderate, and low income groups. The master plan requires each village to be serviced by or provided with roads, utilities, facilities, amenities, and employment and industrial areas, all of which are crucial to the establishment of self-sufficient communities. Neighborhoods, which are components of villages, share common educational and recreational facilities concentrated around a centrally located retail, office, and commercial core. The commercial core is composed of business and industrial property which overall represents about $130 million of the development's $600 million assessable real property. Approximately 20 percent of the 14,600 acres (2,920 acres) is designated for industrial purposes.

---

[5]Howard Research & Development Corp. is a private, for-profit development corporation, which is jointly owned by Connecticut General Life Insurance Co. and Community Research & Development, Inc. (also known as the Rouse Co.). James W. Rouse of the Rouse Co. was the founder of Columbia.

[6]From the outset, the developers set three fundamental goals for Columbia: (1) To create a social and physical environment which would work for people, nourishing human growth; (2) to preserve and enhance the qualities of the land as we build; and (3) as a venture of private capital, to make a profit in the development and sale of land.

The Development Corp. intended to and did develop Columbia as a community that offered a new living style: "a job opportunity for every residence; a dwelling for every job situation: houses and apartments in a wide variety of size and cost, and a chance to live, work, shop and play in the same place." Petitioner was created in an effort to achieve some of these goals.[7] Additionally, and in furtherance of these goals, the Development Corp. transferred 1,400 of Columbia's 14,600 acres to petitioner without receiving any consideration in exchange.

Petitioner's purposes as set forth in its articles of incorporation[8] are as follows:

THIRD: * * *

To organize and operate a civic organization which shall not be organized or operated for profit, but which shall be organized and operated exclusively for the promotion of the common good and social welfare of the people of the community of Columbia and its environs * * *

　　　　*　　*　　*　　*　　*　　*　　*

For the general purpose aforesaid, and limited to that purpose * * *, the corporation shall have the following *specific* purposes:

(1) To aid, promote, and provide for the establishment, advancement and perpetuation of any and all utilities, systems, services and facilities within Columbia which tend to promote the general welfare of its people with regard to health, safety, education, culture, recreation, comfort or convenience to the extent and in the manner deemed desirable by the Board of Directors;

(2) To exercise all the rights, powers and privileges, and to perform all of the duties and interests of the Corporation * * *

　　　　*　　*　　*　　*　　*　　*　　*

(5) To do any and all lawful things and acts that the Corporation may from time to time, in its discretion, deem to be *for the benefit of Columbia and the inhabitants thereof* or advisable, *proper or convenient for the promotion of the interests of said inhabitants* with regard to health, safety, education, culture, recreation, comfort or convenience.

[Emphasis supplied.]

---

[7]The "Deed, Agreement and Declaration of Covenants, Easements, Charges and Liens" provides in part:

"[Howard Research & Development Corp.] has caused [Columbia Park & Recreation Association] to be formed for the purpose of providing a non-profit civic organization to. serve as the representative of the Owners and Residents with respect to: the assessment, collection and application of all charges imposed hereunder; the enforcement of all covenants contained herein and all liens created hereby; and the creation, operation, management and maintenance of the facilities and services * * *."

[8]As amended Oct. 15, 1982.

## Facilities and Services

Petitioner owns and maintains pedestrian and bicycle pathways, parks and open-space areas, 15 neighborhood centers, 16 neighborhood pools, 4 village community centers, 2 tennis clubs, 10 tennis courts, 4 softball fields, a horse center, 2 athletic clubs,[9] 2 golf courses, boat docks, an indoor swim complex, a children's zoo, an ice rink, a visual arts center,[10] and a transportation system.[11] The services offered include a free monthly magazine, a before- and after-school program, a day care program,[12] senior citizen activities, adult education, and a variety of community events and festivals. Of these facilities and services, the following do not have user fees and are open to the public: Pathways, parks, open-space areas, swim complex, one golf course, tennis courts, and community festivals. The transportation system is available for public use, but a fare is charged for its use.[13] The system operates eight buses on nine routes within Columbia. Howard County has been instrumental in securing both State and Federal funding for the system, which constituted 60 percent of ColumBus' 1982[14] operating budget.[15] Howard County replaced the older buses with wheelchair-equipped buses to make the system more accessible.

The before- and after-school program has been available in Columbia's 14 elementary schools since 1972. This program is designed to provide care and supervision on a regular

[9]One athletic club offers squash and racquetball courts, weightlifting equipment, exercise rooms, sauna and whirlpool, and a track. The other athletic club offers a racquetball clubhouse with 16 courts, a restaurant, and a Nautilus center.

[10]The center is operated by a private educational institution and offers classes in painting, sculpture, photography, and other visual arts.

[11]As of 1982, the association's total investment in recreational and community facilities and open-space areas was valued at approximately $20 million.

[12]In 1980, the Department of Human Resources of the State of Maryland formally requested that the association establish a day care system for Howard County. Accordingly, the association contracted to provide for all day care services for the county at cost.

[13]This transportation system serves Columbia and is called the ColumBus system. It is one of four primary types of public transportation serving Howard County. The fares charged are as follows:

| | | | |
|---|---|---|---|
| Adult | $0.75 | Special reduced fares[1] | |
| Senior citizen (with ID) | 0.60 | Senior citizen (with ID) | $0.35 |
| Child (age 6 through 11) | 0.60 | Handicapped (with ID) | 0.35 |
| Child (under age 6) | No charge | | |

[1]Applies Monday through Friday, 9 a.m. through 2 p.m., and all day on Saturdays.

[14]The ColumBus system operates on the association's fiscal year ending Apr. 30.

[15]The 1982 fiscal year transit grant was $160,000, increased from $148,000 in 1981.

basis for school-age children of parents residing in Columbia who either work, attend school or training programs, or have special needs. Children enrolled in the program must be registered, and fees must be paid 1 month in advance of attendance. The fee structure is based on operating a break-even service, including administrative overhead and an energy surcharge.[16] Families may qualify for a half-price fee for this service.[17]

### Financing—Assessments, Fees, and Debt

Part of the cost of providing the desired facilities and services is financed through liens and assessments on all real property in Columbia.[18] The liens secure petitioner's right to collect assessments arising out of the requirement that every property owner pay an annual assessment at a rate not to exceed $0.75 per $100 of "assessed valuation."[19] Petitioner pledged its future assessment revenues to secure repayment of bonds issued to finance the construction of its facilities,[20] and to cover its operating deficits.[21] The assessment system is petitioner's principal source of revenue. The

---

[16]Tuition includes snacks, insurance, and the school's energy surcharge.

The regular rate for children attending on a 5-days-a-week basis varies from $51 per month to $114, depending on the combination of the plan chosen; for example: the before-school program, the after-school program, or a combination of the two.

Session rates of $23 per month are also available for children attending less than 5 days a week.

[17]The care services purchased at half price are purchased from the Maryland Department of Social Services. Approximately 13 families are approved for one-half price access to before- and after-school care each year. Access to half-price care services is determined by family size and total gross annual household income as provided in the Federal Government sec. 8 guidelines.

[18]The "Deed, Agreement and Declaration of Covenants, Easements, Charges and Liens," which was adopted Dec. 13, 1966, provides:

"[Howard Research & Development Corp.] desires to subject the property (whether owned by it or by others) to the covenants, easements, charges and liens imposed hereby in order (i) to provide funds for use as specified * * *"

[19]"Assessed valuation" is the highest valuation placed on the property for county and State real estate tax purposes.

[20]The association is limited by the terms of the bond indentures with respect to the amount of additional debt it may issue.

[21]For the years 1976 through 1982, operating deficits were as follows:

FISCAL YEARS
($000's)

|  | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|---|---|---|
| Revenues: | $4,514 | $5,053 | $5,789 | $6,429 | $7,777 | $9,390 | $10,681 |
| Expenses: | 7,229 | 7,266 | 7,346 | 8,193 | 9,220 | 10,696 | 11,854 |
| Net loss: | 2,715 | 2,213 | 1,557 | 1,764 | 1,443 | 1,306 | 1,173 |

required annual assessment is embodied in the ownership of property in Columbia. This right to ownership carries an inherent right to use the facilities and services offered by petitioner. The payment of the assessed fees is the equivalent of a quid pro quo for the owner's right to use the facilities and services petitioner offers.[22]

In addition to the assessment system, and as a major source of revenue, petitioner has developed a system of user fees.[23] Under this system members pay a stated fee, generally set in excess of cost, for the use of some recreational facilities and services. The use of the terms "member" or "membership" does not denote any exclusivity as to who is eligible to participate in the user fees program. Residents of Columbia, whether owners or lessees of residential, commercial, or industrial properties, are considered members of petitioner for purposes of sharing the services and facilities offered. Nonresidents may, however, become members of petitioner by paying the required user fees.[24] Nonresidents of Columbia who are not employed in the development pay a higher fee than residents,[25] because petitioner's facilities and services are financially

---

[22]The "Deed, Agreement and Declaration of Covenants, Easements, Charges and Liens" provides, in part, as follows:

Section 5.01. * * *

Every Owner, *by reason of such ownership, shall have a right* and easement of enjoyment in and to all Community Facilities, and such easement shall be appurtenant to and shall pass with every Lot upon transfer. All Residents shall have a non-transferable privilege to use and enjoy all Community Facilities for so long as they are Residents * * *. * * * [Columbia Park & Recreation Association] shall have the right to charge Owners and Residents reasonable admission and other fees in connection with the use of any Community Facility. * * *

Section 5.02. [Columbia Park & Recreation Association] shall have the right to suspend the right of any Owner (and the privilege of each Resident claiming through such Owner) for any period during which the Annual Charge assessed under Article II hereof remains overdue and unpaid * * *

[Emphasis supplied.]

[23]User fees represent the second largest source of income (assessment revenue is the largest) for the association. Revenue from recreation facilities rose from $2,844,000 in 1978 to $5,595,000 in 1982.

[24]Members may purchase individual admission tickets for each time a recreational facility is used or may purchase a package plan which entitles the holder to use most of the recreational facilities. In 1982 approximately 23,000 residents held a package plan. No information was included in the administrative record regarding the number of nonresident package plans held.

[25]The theory for this fee distinction was explained in a letter addressed to the Office of the Assistant Commissioner, dated Sept. 9, 1983, as follows:

"residents of Columbia already contribute to the income-transfer or subsidy effect of [Columbia Park & Recreation Association] through the annual assessment. * * * it is thus reasonable to impose slightly higher user fees upon nonresidents who enjoy facilities to which they have not otherwise contributed."

backed by the assessment system. Columbia's lower income families who are unable to pay the user fees may work in public service jobs to earn the use of these facilities through petitioner's Earn-a-Membership Program.[26] In addition to its Earn-a-Membership Program, petitioner offers half-price membership to residents whose household income falls within certain guidelines.[27] Residents and nonresidents, alike, may use the facilities designated as "public," free of charge. Even though petitioner has incurred substantial operating losses, the level of income generated by assessments and recreational facilities has steadily increased,[28] and it is anticipated that as the community develops, a sufficient level of revenues will be achieved to finance its operations and to meet its debt service requirements.

Petitioner has incurred substantial debt for construction and operation of its facilities.[29] As of the fiscal year 1982, long-term debt totaled $45,647,000,[30] an increase of $1,613,000 from 1981 long-term debt of $44,034,000. Of the 1982 long-term debt, $39,121,000 (85.7 percent) was directly

---

[26]Approximately 50 families earn their membership to the recreational facilities each year. Low and moderate income families were those families of four that earned one-half the average Columbia household income which had increased by 31 percent to $37,880 since 1978. For ease of administration, the Federal Government's sec. 8 income guidelines are currently used.

[27]The Federal Government's sec. 8 income guidelines are used for this purpose as well. Approximately 190 families pay one-half price for facility membership each year.

[28]The following schedule reflects the growth in assessment and package plan revenues over the past 4 years:

|  | 1978 | 1979 | 1980 | 1981 |
|---|---|---|---|---|
| Assessments | $2,867,000 | $3,245,000 | $3,775,000 | $4,329,000 |
| Revenues from operations[1] | 2,844,000 | 3,010,000 | 3,680,000 | 4,669,000 |
| Interest income | 78,000 | 174,000 | 278,000 | 312,000 |
| Gain on sale of facilities and equipment | 0 | 0 | 44,000 | 2,000 |
| Total revenues | 5,789,000 | 6,429,000 | 7,777,000 | 9,312,000 |
| *Percentage of Total Revenues:* |  |  |  |  |
| Assessments: | 50% | 50% | 49% | 46% |
| Recreational facilities: | 49% | 47% | 47% | 50% |

[1]Operations include recreational facilities, land management, and community services with approximately 85 percent of the revenue attributable to recreational facilities.

[29]The total outstanding debt of association for the years shown was as follows:

|  | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|
| Long-term debt due in 1 year: | $226,000 | $355,000 | $457,000 | $582,000 |
| Long-term debt due after 1 year: | 41,526,000 | 41,572,000 | 44,034,000 | 45,647,000 |
| Total debt | 41,752,000 | 41,927,000 | 44,491,000 | 46,229,000 |

[30]This total debt included $1,840,000 ($3,769,000 in 1981) subordinated debt payable to Connecticut General Life Insurance Co. and Community Research & Development, Inc. All other subordinated notes payable are guaranteed by the Development Corp.

incurred to finance the facilities and services offered. Petitioner's 1982 debt service was $4,680,000 or 37.7 percent of total expenses.

## Use of Funds and Revenues

All funds collected by petitioner must be applied as mandated by article IV of the "Deed, Agreement and Declaration of Covenants, Easements, Charges and Liens" (declaration), which provides, as follows:

### Use of Funds

Section 4.01. [Columbia Park & Recreation Association] shall apply all funds received by it pursuant to these Restrictions, and all other funds and property received by it from any source * * * to the following, *pro tanto* and in the order stated:

(i) the payment of all principal and interest, when due, on all loans borrowed by [Columbia Park & Recreation Association] * * * ;

(ii) the costs and expenses of [Columbia Park & Recreation Association]; and

(iii) *for the benefit of the Property, Owners and Residents* by devoting the same to the acquisition, construction, reconstruction, conduct, alteration, enlargement, laying, renewal, replacement, repair, maintenance, operation and subsidizing of such of the following as the Board, in its discretion, may from time to time establish or provide:

any or all projects, services, facilities, studies, programs, systems and properties relating to: parks, recreational facilities or services; drainage systems; streets, roads, highways, walkways * * * and any and all other improvements, facilities and services that the Board shall find to be necessary, desirable or beneficial to the interest of the Property, Owners and Residents.

[Emphasis supplied.]

The following schedule reflects the revenues and expenditures for fiscal year 1983. This is representative of petitioner's revenue and expenditure pattern:

### Statement of revenues

| Source | Amount | Percent of total revenues |
|---|---|---|
| Assessments | $4,750,000 | 44.14 |
| Package plans and recreational facilities | 5,118,000 | 47.57 |
| Community service programs | 362,000 | 3.36 |
| Transportation | 263,000 | 2.44 |
| Community centers | 235,000 | 2.18 |
| Land management | 32,000 | 0.30 |
| Totals | 10,760,000 | 99.99 |

*Statement of expenditures*

| Purpose | Amount | Percent of total expenses[31] |
|---|---|---|
| Package plan and recreational facilities | $4,043,000 | 32.57 |
| Debt service | 4,680,000 | 37.70 |
| Open-space maintenance | 862,000 | 6.94 |
| Community and neighborhood | 841,000 | 6.77 |
| Centers and village association general administration | 631,000 | 5.08 |
| Depreciation | 540,000 | 4.35 |
| Transportation | 320,000 | 2.58 |
| Community service programs (before- and after-school care, nursery schools, etc.) | 297,000 | 2.39 |
| Operating reserve | 200,000 | 1.61 |
| Totals | 12,414,000 | 99.99 |

## *"Government" of the Association*

Petitioner's operations are controlled by a democratic decision-making process. Residents of Columbia elect 16 representatives annually who make up petitioner's board of directors (board).[32] The board is responsible for formulating policy as well as budget and financial matters. A number of voluntary resident advisory committees[33] assist the board

---

[31]In 1983, expenses exceeded revenues by $1,654,000.

[32]In the initial years of Columbia, prior to March 1982, the Development Corp. had a right to designate seven of petitioner's directors. Accordingly, the Development Corp. held a voting majority on the association's board (seven of the 11.25 total votes). The remaining 4.25 votes were distributed to the nine directors elected by the residents of Columbia.

[33]About five resident groups including village boards and various resident advisory committees assist the board. The village boards are the governing element of village associations. They are nonprofit civic organizations organized to promote the common interest of the village residents. Their creation is authorized and approved by petitioner in furtherance of its purpose. The funding and legal agreements between petitioner and the village associations are of three types:

(1) Grants to insure the viability of the associations by providing opportunities for the residents to exercise their civic responsibilities and to foster participation in the decision making process, including covenant enforcement, at the local level.

(2) Contracts for the management of certain facilities of the association. Each contract includes an agreement to allocate the use of public space in a manner that is consistent with the *association's goals of providing for the needs of residents* and noncommercial groups in the community. Graduated fee schedules insure access to facilities at below-market rates for residents and nonprofit organizations.

(3) Contracts for the implementation of the association's community service goals, including (i) informing the residents on a city-wide basis of available services and programs; (ii) welcoming newcomers to Columbia and assisting their integration into the community life; and (iii) offering programming which fosters community building and meets the interests and needs of all age groups.

on issues that involve formulating the budget or defining goals and policies. The board meets biweekly to discuss policy and budget matters. Additionally, it operates as a forum for the residents to express their concerns. Residents and village chairpersons are invited to speak out on issues of concern at these meetings. The board does not participate in petitioner's day-to-day operation. This is managed by a paid staff of 100 full-time and 500 part-time employees. The staff is managed by petitioner's officers appointed by the board.

### Distribution of Petitioner's Assets in the Event of Dissolution

Petitioner's articles of incorporation provide that "no member, director, or officer of the corporation, or any private person shall be entitled to share in the distribution of the corporate assets upon dissolution of the corporation or otherwise." Article five further provides:

(2) In the event of the liquidation or winding up of the Corporation (whether voluntary or involuntary) all of the assets of the Corporation (after payment of debts) shall be transferred to and contributed to and shall vest in (a) Howard County, Maryland, a body politic and corporate and a political subdivision of the State of Maryland, or the agency, subdivision or instrumentality of said County appropriate to take title to each of such assets, or (b) any of the Associations or other non-profit civic organizations which are devoted to the social welfare of Columbia or a part thereof as the Board of Directors shall determine.

Moreover, the declaration provides that petitioner shall have the power to assign its rights created under the declaration to any successor nonprofit membership corporation, and upon such assignment the successor corporation shall have all the rights and be subject to all the duties of petitioner. It further provides:

If for any reason [Columbia Park & Recreation Association] shall cease to exist without having first assigned its rights hereunder to a Successor Corporation, the covenants, easements, charges and liens imposed hereunder shall nevertheless continue and any Owner may petition a court of competent jurisdiction to have a trustee appointed for the purpose of organizing a non-profit membership corporation and assigning the rights of [Columbia Park & Recreation Association] hereunder with the same

force and effect, and subject to the same conditions, as provided in this Section 7.04 with respect to an assignment and delegation by [Columbia Park & Recreation Association] to a Successor Corporation.

## Procedural History

Petitioner sought exemption from Federal income tax under section 501(a), which was granted on November 24, 1970, based on respondent's determination that it qualified as a social welfare organization within the meaning of section 501(c)(4). Petitioner now believes that it is more appropriately described as a charitable organization within the meaning of section 501(c)(3), and seeks tax-exempt status as such. On October 22, 1982,[34] the association submitted its Form 1023, Application for Recognition of Exemption, to the District Director of the Internal Revenue Service, Baltimore, Maryland. After exchanges of written materials and a conference on July 28, 1983, petitioner exhausted its administrative remedies to respondent's initial adverse determination. Respondent then issued a final adverse ruling on March 21, 1984, denying petitioner section 501(c)(3) status. The reasons for respondent's determination were stated as follows:

> You are neither organized nor operated exclusively for exempt purposes as required by section 501(c)(3). You do not satisfy the organizational test because your organizing instrument does not limit your purposes to exempt ones within the meaning of section 501(c)(3) and your assets are not permanently dedicated to exempt purposes within the meaning of section 501(c)(3). Further, you do not satisfy the operational test because you possess enforcement and regulatory powers of a governmental nature. In addition, you are operated in furtherance of a substantial non-exempt purpose because you serve private interests.

Respondent's final adverse ruling has no effect upon the association's current section 501(c)(4) status.

## Legal Discussion

Petitioner's central motivation in seeking section 501(c)(3) qualification is to become eligible to use the proceeds of

[34]The envelope in which the application was mailed shows two postmarks, thus creating some confusion as to the actual date of mailing. Oct. 22, 1982, the latter of the two dates indicated, is used.

tax-exempt bonds which might be issued for its benefit by Howard County, or by any other instrumentality of the State of Maryland.[35] Petitioner has the burden of proof and must demonstrate that respondent's determination is erroneous. *Hancock Academy of Savannah, Inc. v. Commissioner*, 69 T.C. 488 (1977); Rule 217(c)(2)(i).

Section 501(c)(3) provides, in relevant part, that an organization shall be exempt from taxation under section 501(a) if the organization is organized and operated exclusively for certain specified exempt purposes,[36] if no part of its net earnings inures to the benefit of a private shareholder or individual,[37] and if no substantial part of its activities consists of political or lobbying activities. Sec. 501(c)(3); *Greater United Navajo Enterprises v. Commissioner*, 74 T.C. 69, 76 (1980), affd. without published opinion 672 F.2d 922 (9th Cir. 1981); *Hancock Academy of Savannah v. Commissioner*, 69 T.C. at 491. These requirements are stated in the conjunctive; failure to satisfy any one of them is fatal to qualification under section 501(c)(3). *Levy Family Tribe Foundation v. Commissioner*, 69 T.C. 615, 618 (1978); *Stevens Bros. Foundation, Inc. v. Commissioner*, 39 T.C. 93, 110 (1962), affd. in part and revd. in part 324 F.2d 633 (8th Cir. 1963), cert. denied 376 U.S. 969 (1964).

The requirement that the organization be "organized and operated exclusively for an exempt purpose" involves two mutually exclusive tests: (1) The organizational test and (2) the operational test, both of which must be satisfied. See sec. 1.501(c)(3)-1(a)(1), (b), and (c), Income Tax Regs. An organization is not regarded as satisfying these tests unless it serves a public rather than a private interest. Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs.; *Retired Teachers Legal Fund v. Commissioner*, 78 T.C. 280, 286 (1982); *Baltimore Health & Welfare Fund v. Commissioner*, 69 T.C. 554 (1978). To satisfy the organizational test, the articles of organization must limit the organization's purpose to one or

---

[35]Sec. 103(b) permits an organization which qualifies under sec. 501(c)(3) to use the proceeds of tax-exempt bonds, without regard to the limitations imposed upon commercial users of such financing. Organizations qualifying under sec. 501(c)(4) are not accorded this benefit.

[36]The specified purposes include religious, charitable, scientific, testing for public safety, literary, educational, or prevention of cruelty to children or animals.

[37]Sec. 1.501(a)-1(c), Income Tax Regs., defines "private shareholder or individual" to include persons having a personal and private interest in the activities of the organization.

14

more exempt purposes and not expressly empower such organization to engage, except insubstantially, in activities which do not further its exempt purpose. Sec. 1.501(c)(3)-1(b)(1), Income Tax Regs. The existence, therefore, of a substantial nonexempt purpose is fatal to section 501(c)(3) qualification. *Better Business Bureau v. United States*, 326 U.S. 279 (1945); *Copyright Clearance Center v. Commissioner*, 79 T.C. 793, 804 (1982); *est of Hawaii v. Commissioner*, 71 T.C. 1067 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); *Christian Stewardship Assistance v. Commissioner*, 70 T.C. 1037, 1040 (1978); *Fides Publishers Association v. United States*, 263 F. Supp. 924, 935 (N.D. Ind. 1967). Moreover, an organization will not qualify as being "organized exclusively for one or more exempt purposes" unless its assets are dedicated to an exempt purpose. Sec. 1.501(c)(3)-1(b)(4), Income Tax Regs. Section 1.501(c)(3)-1(b)(4), Income Tax Regs., provides in pertinent part:

An organization's assets will be considered dedicated to an exempt purpose, for example, if, upon dissolution, such assets would, by reason of a provision in the organization's articles or by operation of law, be distributed for one or more exempt purposes, or to the Federal government, or to a State or local government, for a public purpose, or would be distributed by a court to another organization to be used in such manner as in the judgment of the court will best accomplish the general purposes for which the dissolved organization was organized. However, an organization does not meet the organizational test if its articles or the law of the State in which it was created provide that its assets would, upon dissolution, be distributed to its members or shareholders.

Respondent argues that petitioner fails the organizational test, in part, because its articles do not limit its purpose to an exempt purpose within the meaning of section 501(c)(3) and that petitioner serves a substantial nonexempt purpose that is expressly permitted by its articles. Respondent also argues that petitioner fails the organizational test because of its "distribution of assets on dissolution" provision. Petitioner, on the other hand, argues that it meets the organizational test because its articles limit its purpose to a charitable purpose within the meaning of section 501(c)(3).

Petitioner further contends that its articles do not permit, and it does not substantially engage in, activities which do not further an exempt purpose. Additionally, petitioner argues that its "distribution of assets on dissolution" provision qualifies under the organizational test. After careful examination of the administrative record, we agree with respondent.

## Organizational Test

### Charitable Purpose Within the Meaning of Sec. 501(c)(3)

Respondent contends that petitioner was created, as set forth in its articles, for the purpose of providing substantial recreational facilities and community services to its property owner/members. This, respondent argues, is not an exempt purpose within the meaning of section 501(c)(3). We agree.

Petitioner takes the position that because it qualifies as a social welfare organization within the meaning of section 501(c)(4) and is not an "action" organization it must qualify as a charitable organization within the meaning of section 501(c)(3). Petitioner relies on section 1.501(c)(4)-1(a)(2), Income Tax Regs., as support for this argument. Petitioner's reliance is misplaced. Section 1.501(c)(4)-1(a)(2)(i), Income Tax Regs., provides in pertinent part that a social welfare organization within the meaning of section 501(c)(4) will qualify for exemption as a charitable organization if (1) *it falls within the definition of "charitable" as set forth in section 1.501(c)(3)-1(d)(2), Income Tax Regs.*, and (2) is not an "action" organization as set forth in section 1.501(c)(3)-1(c)(3), Income Tax Regs.[38] Consequently, petitioner must meet the definition of "charitable" independently of its

---

[38]Sec. 1.501(c)(3)-1(c)(3)(ii), Income Tax Regs., provides in pertinent part as follows:

An organization is an "action" organization if a substantial part of its activities is attempting to influence legislation by propaganda or otherwise. For this purpose, an organization will be regarded as attempting to influence legislation if the organization:

  (a) Contacts, or urges the public to contact, members of a legislative body for the purpose of proposing, supporting, or opposing legislation; or
  (b) Advocates the adoption or rejection of legislation.

The term "legislation", as used in this subdivision, includes action by the Congress, by any State legislature, by any local council or similar governing body, or by the public in a referendum, initiative, constitutional amendment, or similar procedure. * * *

"social welfare" status. Petitioner has failed in this regard.

Section 1.501(c)(3)-1(d)(2), Income Tax Regs., provides as follows:

"charitable" is used in section 501(c)(3) in its generally accepted legal sense and is, therefore, not to be construed as limited by the separate enumeration in section 501(c)(3) of other tax-exempt purposes which may fall within the broad outlines of "charity" as developed by judicial decisions. Such term includes: Relief of the poor and distressed or of the underprivileged; advancement of religion; advancement of education or science; erection or maintenance of public buildings, monuments, or works; lessening of the burdens of Government; *and promotion of social welfare by organizations designed to accomplish any of the above purposes, or (i) to lessen neighborhood tensions; (ii) to eliminate prejudice and discrimination; (iii) to defend human and civil rights secured by law; or (iv) to combat community deterioration and juvenile delinquency.* * * * [Emphasis supplied.]

Petitioner's interpretation of section 1.501(c)(3)-1(d)(2), Income Tax Regs., ignores the statutory language requiring that petitioner be created for and limited (except insubstantially) to one or more of the purposes enumerated therein. We find that petitioner's promotion of the social welfare of the people of Columbia does not accomplish any of the purposes enumerated in section 1.501(c)(3)-1(d)(2), Income Tax Regs.

The purpose for which an organization was created, as used in the organizational test, refers to the real substance and intent of the organization. See *Samuel Friedland Foundation v. United States*, 144 F. Supp. 74, 84 (D. N.J. 1956). Accordingly, the purpose for which petitioner was created may be determined from examining its articles and the circumstances surrounding its creation. This is a question of fact to be determined by the objectives motivating petitioner, as well as petitioner's subsequent conduct. *Waller v. Commissioner*, 39 T.C. 665 (1963); *Commissioner v. John Danz Charitable Trust*, 284 F.2d 726 (9th Cir. 1960); see also *Peoples Translation Service v. Commissioner*, 72 T.C. 42 (1979). A careful reading of petitioner's articles and a close examination of the surrounding circumstances do not support petitioner's argument that it was organized

principally for a charitable purpose within the meaning of section 501(c)(3).

Petitioner's articles provide that petitioner was created for the general purpose of promoting the common good and social welfare of the people of Columbia, in addition to the following specific purposes:

(1) To aid, promote, and provide for the establishment, advancement and perpetuation of any and all utilities, systems, services and facilities within Columbia which tend to promote the general welfare of its people with regard to health, safety, education, culture, *recreation, comfort or convenience* * * * ;

(2) To exercise all the rights, powers and privileges and *to perform all of the duties and obligations of the Corporation* * * *

[Emphasis supplied.]

We find these purposes to be substantially nonexempt within the meaning of section 501(c)(3).

Petitioner contends, that because of its size and diversity, its purpose must be understood from the benefit it provides through its overall operations. We have carefully considered the scope of petitioner's operations and agree that the magnitude of its operations cannot be ignored. The estimated 110,000 residents of Columbia[39] represent a cross-section of economic, social, and racial classes. They are served by petitioner which integrates these different classes while nourishing human growth. This, however, is incidental to petitioner's primary purpose, which is to promote the common good and social welfare of the residents of Columbia. Petitioner is an integral part of the development and was created to serve Columbia, its residents, and property owners. As petitioner's articles demonstrate, Columbia and its residents are the justification for petitioner's existence. Accordingly, any benefit to the community as a whole is merely incidental and relatively insubstantial. Columbia approximates the size of Manhattan, and has the second largest population in the State of Maryland. It is a new experiment in city planning where its developers sought to balance social goals and private profit. Columbia, despite its size, has remained a private development designed to offer

---

[39]The projected "full occupancy" population of Columbia is greater than the population of any city in Maryland except Baltimore.

its residents a new living style: a job opportunity for every resident; a dwelling for every job situation; houses and apartments in a wide variety of sizes and cost; and a chance to live, work, shop, and play in the same place. This new lifestyle could not be offered in its entirety without the creation of petitioner or a similar organization. Indeed, petitioner was organized by the developers of Columbia as an integral part of the development, and it so functions. Accordingly, we find that petitioner was created as the component necessary for molding the social and physical environment desired for the development.

We emphasize that the term "charity," from a legal perspective, is comprised of four principal divisions: (1) Relief of poverty; (2) advancement of education; (3) advancement of religion; and (4) other purposes (not falling within any of the preceding divisions) that are beneficial to the public or the community at large. See *Eastern Kentucky Welfare Rights Org. v. Simon*, 506 F.2d 1278, 1287 (D.C. Cir. 1974); *Mellon Bank, N.A. v. United States*, 590 F. Supp. 160, 163 (W.D. Pa. 1984); *Green v. Connally*, 330 F. Supp. 1150, 1157 (D.D.C. 1971); 2 Restatement, Trusts 2d, sec. 368 (1977).

Petitioner contends that the size of the development it benefits is so large that it qualifies under the "catch all" category of "charitable," i.e., a benefit to the public or the community at large. In essence, petitioner argues that its size causes it to be inherently charitable. We find this argument unpersuasive. Petitioner benefits what is merely an aggregation of homeowners and tenants bound together in a structural unit formed as an integral part of a plan for the development of real estate. We do not perceive such a group of people as the "community at large" within the "charitable" context because it lacks a sufficient public element. To hold otherwise would negate the requirement that petitioner must serve a public rather than a private interest. Sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs.

Columbia was planned as a new town and is referred to as a city.[40] We agree that Columbia resembles a city in both

---

[40]Columbia and its planning process was fully described in the Architects Year Book under the article entitled, "The Columbia Process: The Potential for New Towns," written by Morton Hoppenfeld. Mr. Hoppenfeld refers to being involved in the process of building a new city called Columbia and continues to refer to Columbia as a city throughout the article. Columbia

geographic size and population and that it operates, to a large extent, like a city. Nevertheless, Columbia has remained nothing more than a private development, albeit a massive one.[41] We should not be guided merely by petitioner's size because qualitative not quantitative factors are more determinative of the charitable purpose of an organization. The size of an organization is meaningless if it is not fully integrated with a public element. Mere size does not transform an otherwise noncharitable, private organization to a "charitable" one. If Columbia were a development of greatly reduced size with a small population, it would be easier to see why petitioner does not qualify as a "charitable" organization within the meaning of section 501(c)(3). The results do not change with petitioner's size. To the extent that Columbia is owned and controlled by the homeowners and residents within its boundaries, free from any governmental or other outside influence, we find that it is an unusually large aggregation of private interests.

Were petitioner operating primarily for a public rather than private interest, the people financing its operation would not have a right, based upon property ownership, to receive the benefits it offers.[42] On the contrary, once financed, petitioner would offer its facilities and service programs primarily to those in need regardless of their place of residence. Unlike the instant case, no quid pro quo exists in an organization that is operating primarily for a public purpose.

Another important factor which serves to undercut petitioner's position is the fact that petitioner's method of financing is dissimilar from typical public organizations. Petitioner does not solicit or receive voluntary contributions from the public. Rather, its source of revenue is from the members whom it serves. Petitioner thus lacks this normal

---

was indeed planned and developed as a city. Despite its similarity to a city in size and operation, Columbia has not sought to be incorporated as a city.

[41]We note that nothing has changed with respect to the nature of ownership since the initial private development of Columbia and the sale of Columbia as such, except for the increased number of homes and rental units completed and occupied and the pursuance of the goal of presenting Columbia as the new living experience it was intended to be.

[42]The declaration provides that every property owner, *by reason of such ownership shall have a right* and easement of enjoyment in and to all community facilities.

trait of a section 501(c)(3) organization or, more specifically, an organization which operates primarily for a public interest.[43]

Additionally, petitioner's facilities and services which are open to the public[44] constitute a small percentage of petitioner's total assets and a rather limited percentage of petitioner's budget, in amounts approximately as follows: ColumBus system—2 percent of revenues and 2½ percent of expenditures; open-space areas, parks, and pathways—1/2 percent of revenues and 6 percent of expenditures; community service programs, including before- and after-school care and day care—3 percent of revenues and 2 percent of expenditures. Also negating petitioner's contention that it exists primarily to serve a public interest is the small number of families that qualify for reduced and earned membership fees. Columbia, with an estimated population of 110,000, has approximately: 190 families qualifying for one-half price membership; 50 families qualifying for "earned membership," and 13 families approved for one-half price before- and after-school care. Families of Howard County or, more broadly, the State of Maryland, are not eligible for such reduced prices. A significant requirement is that such recipients be residents of Columbia. These facts reflect that petitioner's activities are substantially for the promotion and protection of the interest of its members; this is a substantial nonexempt purpose within the meaning of section 501(c)(3).

We note that Columbia may be able to avail itself of the very section 501(c)(3) tax benefits it seeks, by incorporation as a city. To do this, however, might divest petitioner and its members of the right to manage and control Columbia in accordance with their desires. Columbia cannot be a city for purposes of availing itself of tax benefits that were intended for organizations of a public nature and, at the same time, be a privately owned and controlled development. Petitioner is bound by the consequences of its choice. We do not find

---

[43]Deduction under sec. 170 of amounts contributed to a sec. 501(c)(3) organization is a hallmark of sec. 501(c)(3) organizations. In the instant case no part of the admission fees or the assessment income would be deductible under sec. 170 because the payers are considered to have received benefits of equal or greater value.

[44]Pathways, parks, open-space areas, swim complex, one golf course, tennis courts, community festivals, and the ColumBus system.

persuasive petitioner's argument that its charitable purpose is to lessen the burdens of government. Petitioner contends that it provides a wide range of services and facilities to the residents of Columbia which, in petitioner's absence, would have to be provided by the local or State government. We reject this argument. The mere assertion that, in petitioner's absence, government would have to assume the activities in question does not mean that the activities are in fact the burdens of government. See *Child v. United States*, 540 F.2d 579 (2d Cir. 1976). Before petitioner can be classified as having the charitable purpose of lessening the burdens of government, it must demonstrate that the State of Maryland and/or Howard County accepts the activities conducted by petitioner as their responsibility and recognize petitioner as acting on their behalf. Petitioner must further establish that its activities actually lessen the burden of the State or local government.[45] Petitioner has failed to so demonstrate,[46] and has even advanced the argument that it does not act on the behalf of either the State of Maryland or Howard County. Neither does it possess any governmental power, delegated or otherwise.[47] Petitioner cannot have its classification both ways: as a surrogate government for some purposes and the representative of a private development for others.

---

[45]The criteria for determining whether an organization's activities lessen the burdens of government are: (1) Whether the governmental unit considers the organization's activities to be its burden; and (2) whether these activities actually lessen the burden of government. See Rev. Rul. 85-1, 1985-1 C.B. 178.

Rev. Rul. 85-2, 1985-1 C.B. 178, 179, provides that:

"The fact that an organization is engaged in an activity that is sometimes undertaken by the government is insufficient to establish a burden of government. Similarly, the fact that the government or an official of the government expresses approval of an organization and its activities is also not sufficient to establish that the organization is lessening the burdens of government. * * *"

[46]Petitioner seeks to meet its burden of proof in this respect by contending that because it expends funds for transportation services, social services, public parks, paths and recreational facilities and preservation of open spaces, and because the major expenditure items in its budget are similar to those in the budget of a municipal governing body serving a comparable community, it directly lessens the burdens of government. This, however, does not establish that the State of Maryland or Howard County accepts any of these activities as their responsibility. On the contrary, in contributing to the maintenance of the transportation system and paths outside the boundaries of Columbia, Howard County has made it clear that it expects Columbia to bear its share of the responsibility.

[47]Petitioner advances this argument in its effort to establish its nongovernmental status for purposes of enforcing and collecting the assessment revenue.

*Distribution of Assets on Dissolution*

Respondent argues that petitioner's assets are not permanently dedicated to an exempt purpose and that it therefore fails the organizational test. Respondent contends that petitioner's articles provide for the distribution of the assets on dissolution for a nonexempt purpose within the meaning of section 501(c)(3) contrary to section 1.501(c)(3)-1(b)(4), Income Tax Regs. Petitioner counters that the distribution methods provided in section 1.501(c)(3)-1(b)(4), Income Tax Regs., are not all-inclusive. Thus, petitioner maintains, its assets are permanently dedicated to an exempt purpose within the meaning of section 501(c)(3). We agree with respondent.

Although we agree with petitioner that the distribution methods enumerated in section 1.501(c)(3)-1(b)(4), Income Tax Regs., are not all-inclusive, we find that its assets are not permanently dedicated to an exempt purpose within the meaning of section 501(c)(3). The examples of distribution methods provided in section 1.501(c)(3)-1(b)(4), Income Tax Regs., all demonstrate the critical factor that the assets must be distributed to an organization where they will be used for one of the purposes listed in section 501(c)(3).[48] The distribution provision in petitioner's articles does not satisfy this requirement. Upon dissolution, the assets are to be distributed to Howard County, an agency or subdivision or instrumentality of said county that is authorized to take title to each such asset, or any of the associations or other nonprofit civic organizations which are devoted to the promotion of the social welfare of the residents of Columbia. Correspondingly, any successor corporation must assume all of petitioner's rights and liabilities, thereby obligating itself to use the assets for the promotion of the social welfare of the residents of Columbia. Because we have found that the promotion of the common good and social welfare of the residents of Columbia is not a charitable purpose within the meaning of section 501(c)(3), we find that petitioner's

---

[48]The following examples are given as acceptable methods of distribution: (1) For one or more exempt purposes; (2) to a state or local government for a public purpose; and (3) by a court to another organization to be used in such manner as in the judgment of the court will best accomplish the general purposes for which the dissolved organization was organized. Sec. 1.501(c)(3)-1(b)(4), Income Tax Regs.

method of distribution, as provided in its articles, does not meet the requirements of section 1.501(c)(3)-1(b)(4), Income Tax Regs.

Alternatively, petitioner may meet the "distribution of assets on dissolution" requirement, if by operation of law, petitioner's assets will be distributed by a "qualified" method. See sec. 1.501(c)(3)-1(b)(4), Income Tax Regs. However, petitioner fails in this regard as well.

Relevant Maryland law provides:

Sec. 127. Disposition of property of charitable or religious corporations upon dissolution.

Whenever any charitable or religious corporation is dissolved or about to be dissolved, or for any reason it is impracticable or inexpedient to continue the corporation activities, and all or any part of the corporate property is not needed for the payment of the corporate debts, a court of equity shall have power to determine by its decree the disposition of said property; and, in such case, insofar as any donors of property to the corporation, or their successors in interest, may not be entitled to such property as a result of the cessation of the corporate activities, or may fail to assert any claim thereto, after having received notice of the substance and object of the bill or petition either by personal summons or by such publication as the court shall direct, the court shall, so far as possible, direct or provide for the transfer of such property to any other corporation or association of this or another state, having a similar or analogous character or purpose, or in some way associated or connected with the corporation to which the property has previously belonged, the intent of this section being that courts of equity may in such cases exercise the judicial power of cy pres, in order to carry out, in spite of the change of circumstances, the general purpose of the donor or donors of the property as regards the application and utilization of the gift or gifts. [Md. Ann. Code art. 16, sec. 127 (1981).]

Consequently, for petitioner to qualify through the operation of Maryland law it must first qualify as a charitable organization within the meaning of section 501(c)(3). We have found that petitioner does not so qualify.

Petitioner argues alternatively that should this Court find that petitioner's articles do not permanently dedicate its assets to an exempt purpose, we should not sustain respondent's adverse determination but, rather, we should enter a decision in petitioner's favor conditioned upon a proposed amendment of its articles. We find no authority upon which to issue a conditional ruling, and petitioner has

not provided any authority in support of that result. Moreover, this Court has held that failure to meet the "distribution of assets on dissolution" requirement of section 1.501(c)(3)-1(b)(4), Income Tax Regs., is adequate grounds for the denial of tax exemption as a section 501(c)(3) organization. *Schoger Foundation v. Commissioner*, 76 T.C. 380 (1981); *Gen. Conf. of the Free Church v. Commissioner*, 71 T.C. 920, 928-929 (1979).

## Operational Test

In further support of his adverse determination, respondent argues that petitioner fails the operational test because it engages primarily in activities that further a nonexempt purpose by substantially serving the private interest of its owner/members. Petitioner maintains that any benefit resulting to the residents of Columbia is merely incidental to the benefit to the community as a whole. We agree with respondent.

In order to satisfy the operational test, an organization must engage extensively in activities which accomplish one or more of the exempt purposes specified in section 501(c)(3). Sec. 1.501(c)(3), Income Tax Regs; *Copyright Clearance Center v. Commissioner*, 79 T.C. 793, 803-804 (1982); *Retired Teachers Legal Fund v. Commissioner*, 78 T.C. 280, 289 (1982). The existence of a substantial nonexempt purpose, even if coexisting with an exempt purpose, precludes qualification under section 501(c)(3). Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs.; *Better Business Bureau v. United States*, 326 U.S. 279, 283 (1945); *Christian Manner International v. Commissioner*, 71 T.C. 661, 668 (1979). Whether the operational test has been satisfied is a question of fact. *Christian Stewardship Assistance v. Commissioner*, 70 T.C. 1037, 1042 (1978); *Pulpit Resource v. Commissioner*, 70 T.C. 594, 602 (1978). We find that petitioner does not satisfy the operational test but rather operated for the substantial nonexempt purpose of providing comfort and convenience to Columbia's residents.

The user fees and the assessments each generate an estimated 48 percent of petitioner's total revenues.[49] Approximately 33 percent of petitioner's expenditures is spent on maintaining and managing the recreational facilities, with an additional 38 percent expended to service the debt incurred primarily for the construction of these facilities. In contrast, various nonrecreational activities represent an approximate percentage of total revenue, as follows: Community service programs—3 percent; transportation[50]—2 percent; community centers—2 percent; land management— less than 1 percent. Conversely, expenditures for maintenance of various activities represent an approximate percentage of total expenditures, as follows: Community centers—6 percent; community service programs[51]—2 percent; transportation—3 percent; and open space—6 percent. Petitioner's pattern of expenditure is dictated by its articles. Pursuant to the articles, all funds must be expended primarily for the payment of all debt principal and interest due, petitioner's administrative costs and expenses, and for the benefit of the property, owners and residents of Columbia.[52] The net effect of this is the maintenance of an organization that operates substantially for the benefit of the residents and property owners of Columbia.[53]

Apparently, petitioner interprets the "private benefit" element of section 1.501(c)(3)-1(c)(2), Income Tax Regs., to be present only if one of its board members or officers derives some prohibited benefit. We disagree with this interpretation. Section 1.501(a)-1(c), Income Tax Regs., provides that a private interest exists if any person having a private or personal interest in petitioner's activities is the focus of petitioner's benefit.

We find it difficult to accept petitioner's contention that the residents and property owners do not have a personal interest in petitioner and the "new life style" petitioner was

[49]See note 28 *supra*.

[50]Refers to the ColumBus transportation system.

[51]Includes before- and after-school care, child care, etc.

[52]In expending funds for the benefit of the property, owners, and residents of Columbia, the board of directors is free to determine what is *necessary, desirable or beneficial to the interest of such property, owners or residents.*

[53]Petitioner incurred debt primarily to construct the facilities for the benefit of the residents of Columbia. Furthermore, because petitioner was organized to serve the Columbia residents, the operational costs are considered to be expended for the benefit of such residents.

organized to provide. Petitioner's operations are controlled by the residents and property owners of Columbia. In addition, residents' advisory committees participate in formulating petitioner's budget and defining its goals and policies. Moreover, a substantial number of petitioner's activities are solely for the purpose of providing the "new life style" promised to the residents of the development. We, therefore, find that the residents and property owners of Columbia are the intended beneficiaries of petitioner's facilities and services and that they have a personal interest in petitioner's activities.

The retail, office, and commercial core of the development was integrated into the master plan to provide the residents with the opportunity to "work and shop" in the same place. Petitioner was incorporated to provide all the necessary facilities that would enable the residents to "play" in the same place, thus completing the new living style that was intended by the developers. Indeed, petitioner engages substantially in activities which provide for the comfort and convenience of the residents of Columbia to "play" in the same community in which they live, shop, and work. To hold otherwise would ignore the contents of the administrative record.

Not only is petitioner operated by the residents and property owners of the development but it is also financed by them in return for the benefits petitioner makes available to them. About 96 percent of petitioner's revenues is supplied by the residents and property owners of Columbia from property assessments or fees paid for admission to facilities or programs. In exchange, petitioner constructed and maintains facilities valued at approximately $20 million to be used at all times for the benefit and common good of the residents of this commercial development. We cannot be oblivious to the fact that residents, property owners, and employees of businesses located in Columbia must pay an admission fee to the facilities. We accord this little weight, however, because resident fees are lower than nonresident fees. The residents are considered to have paid the remaining portion through the assessment levied against their property.

Petitioner argues that the activities in which it engages have been held to be charitable in nature, and therefore it engages substantially in activities which qualify under section 501(c)(3).[54] In support of its position, petitioner enumerates activities such as maintaining public parks and playgrounds,[55] open-space areas,[56] swimming pools and other recreational facilities,[57] preschool education,[58] public transportation,[59] community centers,[60] municipal planning and safety,[61] center for visual arts,[62] senior citizen activities,[63] recreational and athletic programs,[64] lakes,[65] and public meetings and forums.[66] We agree that the activities in the cases and rulings cited by petitioner were held to be "charitable" within the meaning of section 501(c)(3). Petitioner, however, overlooks a major qualifying element in all these cases. The activities were not found to be charitable per se. Rather, they qualified because the various organizations involved were found to be organized for a charitable purpose and such activities accomplished that purpose. Our holding that petitioner was not organized for a charitable purpose precludes the same result as the cited cases and rulings because without the exempt purpose, the activities do not come within the "charitable umbrella" of an exempt organization. In applying the operational test, the purpose towards which an organization's activities are directed, and not the nature of the activities, is determinative. *B.S.W. Group, Inc. v. Commissioner*, 70 T.C. 352, 356-357 (1978); *est of Hawaii v. Commissioner*, 71 T.C. 1067, 1078-1079

[54]Petitioner cites numerous revenue rulings and some case law in support of this proposition.

[55]*Blydenburgh v. Commissioner*, 5 B.T.A. 834 (1926); Rev. Rul. 78-85, 1978-1 C.B. 150; Rev. Rul. 66-358, 1966-2 C.B. 218; Rev. Rul. 65-2, 1965-1 C.B. 227.

[56]Rev. Rul. 76-204, 1976-1 C.B. 152.

[57]*Peters v. Commissioner*, 21 T.C. 55 (1953); Rev. Rul. 59-310, 1959-2 C.B. 146.

[58]*San Francisco Infant School v. Commissioner*, 69 T.C. 957 (1978); *Michigan Early Childhood Center, Inc. v. Commissioner*, T.C. Memo. 1978-186; Rev. Rul. 70-533, 1970-2 C.B. 112; Rev. Rul. 68-166, 1968-1 C.B. 255.

[59]Rev. Rul. 78-68, 1978-1 C.B. 149; Rev. Rul. 71-29, 1971-1 C.B. 150.

[60]Rev. Rul. 69-572, 1969-2 C.B. 119.

[61]Rev. Rul. 70-79, 1970-1 C.B. 127; Rev. Rul. 76-418, 1976-2 C.B. 145; Rev. Rul. 67-391, 1967-2 C.B. 190.

[62]Rev. Rul. 64-175, 1964-1 C.B. 185; Rev. Rul. 76-443, 1976-2 C.B. 149.

[63]Rev. Rul. 77-365, 1977-2 C.B. 192.

[64]Rev. Rul. 75-198, 1975-1 C.B. 157.

[65]Rev. Rul. 70-186, 1970-1 C.B. 129.

[66]Rev. Rul. 66-256, 1966-2 C.B. 210.

(1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

Petitioner, in serving Columbia, does produce socially desirable results. Nonetheless, the scope of our consideration does not include a determination of the success or effectiveness of petitioner or Development, but to decide whether petitioner should be afforded the statutory privileges of section 501(c)(3) status. The tax relief to which petitioner is already entitled under section 501(a) is unaffected by our holding that respondent did not err in denying section 501(c)(3) status to petitioner.

*An appropriate order will be entered.*

Reviewed by the Court.

STERRETT, SIMPSON, CHABOT, NIMS, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, WRIGHT, PARR, and WELLS, *JJ.*, agree with this opinion.

JACOBS and WILLIAMS, *JJ.*, did not participate in the consideration of this case.