T.C. Memo. 2011-20

UNITED STATES TAX COURT

ASMARK INSTITUTE, INCORPORATED, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30238-07X.                    Filed January 24, 2011.

E. Michael Paturis, for petitioner.

William I. Miller, for respondent.

MEMORANDUM OPINION

MORRISON, Judge:  Pursuant to section 7428(a),[1] petitioner,
Asmark Institute, Inc., seeks a declaratory judgment that it
meets the requirements of section 501(c)(3) and is therefore
exempt from federal income taxation.  It exhausted its

_____

[1]All section references are to the Internal Revenue Code of
1986, as amended.

administrative remedies as required by section 7428(b)(2) and Rule 210(c)(4).[2]  It received a final adverse determination letter dated November 8, 2007.  It invoked the jurisdiction of this Court by a petition filed December 31, 2007.  This case was submitted for decision on the stipulated "Administrative record" as defined in Rule 210(b)(12).

## Background

The petitioner, Asmark Institute, Inc., will be referred to as Asmark Institute.  Asmark Institute had a for-profit predecessor.  We refer to this predecessor by its full name, Asmark, Inc.  The respondent will be referred to here as the IRS.  In briefing this case after trial, Asmark Institute failed to propose findings of fact regarding most of the factual disagreements that it had with the IRS.

1.   Asmark, Inc.: The Predecessor of Asmark Institute

Asmark, Inc., a for-profit company, began in 1990 with 25 clients.  By February 15, 2005, Asmark, Inc., provided risk management services to 985 farm retailers.[3]  It developed expertise in understanding government regulations that affect agricultural businesses.  It became a resource center for agricultural businesses by providing educational material,

------

[2]All Rule references are to the Tax Court Rules of Practice and Procedure.

[3]By "farm retailers" we mean businesses that sell goods and services mostly to farms.

training programs, and on-site inspections.  It also created computer programs that allowed businesses to file timely reports with government agencies.  Its mission was to help agricultural businesses comply with government regulations.  Its owners and their ownership shares were Allen C. Summers, Jr. (37.5 percent), his wife, Susan Summers (37.5 percent), and Johnnie R. Lawrence (25 percent).  Allen C. Summers served as president.  We infer that there were only two other officers, Susan Summers and Johnnie R. Lawrence.

On its Form 1120S, U.S. Income Tax Return for an S Corporation, for the calendar year 2005, Asmark, Inc., reported ordinary business income of $472,378.  It also reported that "Compensation of officers" was $112,200.  In the calendar year 2005, Asmark, Inc., paid salaries to its "officers" and "directors" of $112,200.  On its 2005 Form 1120S, Asmark, Inc., reported that "Salaries and wages" were $391,368.  In the calendar year 2005, Asmark, Inc. paid "salaries" and "wages" of $391,368.  During 2005, Asmark, Inc., paid "total salaries" of $503,568 (which is the sum of $112,200 and $391,368).

Landmark Technologies, L.L.C., was a for-profit company that owned properties used in the operations of Asmark, Inc.  The owners of Landmark Technologies, L.L.C., were Allen C. Summers, Susan Summers, and Johnnie R. Lawrence.

Asmark, Inc., recognized that it would greatly improve its market share if it could gain access to the farm retailers who were members of trade associations. Yet it was reluctant to cooperate with the associations because it feared that it would lose control of its trade secrets. By converting to a nonprofit corporation, it believed that it would no longer be obligated to protect its trade secrets and it could therefore cooperate with the associations.

2. <u>Organization of Asmark Institute</u>

On March 22, 2005, Asmark Institute was incorporated as a nonstock, nonprofit corporation under the laws of Kentucky. Asmark Institute had its principal office in Owensboro, Kentucky.

Article II of its articles of incorporation, dated March 14, 2005, provides that Asmark Institute "is organized exclusively for the purpose of serving as a resource center for compliance materials and services for the agribusiness industry". Article VI provides in part:

> Not withstanding [sic] any other provision of these articles, the corporation shall not carry on any other activities not permitted to be carried on:
> a. By a corporation exempt from federal income tax under Section 501(c)(3) of the Internal Revenue Code, or corresponding section of any future federal tax code, or

> *   *   *   *   *   *   *

Article VII states in part:

> The Corporation is irrevocable [sic] dedicated to and is organized and operated exclusively for charitable

purposes within the section of 501(c)(3) of the Internal Revenue Code, or corresponding section of any future code.

According to its bylaws, the purpose of Asmark Institute is to:

(1)  Serve as a national resource center for regulatory compliance assistance to agricultural retailers and related agricultural businesses, and trade associations;
(2) Promote knowledge of regulatory compliance requirements;
(3) Serve as the national coordinating institution for creation, development and administration of compliance-related aids, materials, products, tools or other solutions pertinent to the needs of agricultural retailers and related businesses;
(4) Advance industry-standards and conformity with compliance as a means of benefitting the public health, safety, welfare and environment;
(5) Promote industry-standard educational opportunities and materials as a means of facilitating compliance and safer work environments;
(6)  Cooperate with departments and agencies of federal, state and local governments in achieving optimum compatibility between regulatory compliance requirements and the efforts of industry and commerce;
(7) Promote cooperation and support between the state and national trade associations and/or organizations directly related to the interests of agricultural retailers and related businesses;
(8) Communicate and cooperate with other industries and organizations on issues of mutual interest; and
(9)  Establish high standards of business ethics and professionalism.

Asmark Institute was not affiliated with a governmental agency.

In June 2005, Asmark Institute filed an application asking the IRS to recognize that it was exempt from tax under section 501(c)(3).  At the time that it filed the application, Asmark

Institute had not yet begun operations and did not have any assets.

Asmark, Inc., transferred all of its assets, worth $205,000 and consisting of supplies, furniture, and computers, to Asmark Institute. Asmark Institute did not assume the liabilities of Asmark, Inc. The Asmark website announced that "On September 1, 2005, Asmark, Inc., officially became the Asmark Institute." On December 31, 2005, Asmark Institute entered into a lease agreement with Landmark Technologies, L.L.C. This lease was similar to the lease between Landmark Technologies, L.L.C., and Asmark Institute's predecessor, Asmark, Inc. The lease entitled Asmark Institute to use a 16,164-square-foot office building situated on a 3.22-acre lot. The building was used by Asmark Institute as offices, a training facility, and warehouse space. The rent was $120,000 per year.

On March 20, 2006, Asmark, Inc., was dissolved. The dissolution did not occur earlier because its owners had been waiting for the IRS to act on Asmark Institute's application for recognition of exempt status. When the IRS asked for more information instead of reaching a decision, the owners decided to dissolve the corporation.

3. Asmark Institute's Employees

Asmark Institute had the same employees as its predecessor, Asmark, Inc. Allen C. Summers served as president. Susan

Summers served as secretary/treasurer. Johnnie R. Lawrence served as vice president. Asmark's board of directors consisted of Allen C. Summers, representatives of its members (except governments and educational institutions), and representatives of the fertilizer and agrichemical industry.

Asmark Institute projected that its total salary expense would be:

Asmark, Inc.
Projected Salaries

| Position | 2006 | 2007 | 2008 |
|---|---|---|---|
| Officers/directors | $533,000 | $533,000 | $533,000 |
| Other salaries | 270,000 | 280,000 | 290,000 |
| Total salaries | 803,000 | 813,000 | 823,000 |

Of the $533,000 projected to be the salaries for "Officers/Directors", $187,500 would be paid to Allen C. Summers, $187,500 would be paid to Susan Summers, and $157,500 would be paid to Johnnie R. Lawrence.

4. Revenues

Asmark Institute believed that all of its income would be derived from fees for the services it would render. It thought that its fees for 2006, 2007, and 2008 would be $1,900,000, $2 million and $2,240,000, respectively. Asmark Institute did not intend to collect any income from grants, donations, or fundraising operations.

5.    Services Generally

The general function of Asmark Institute was to help agricultural retailers comply with OSHA, EPA, DOT, and DHS regulatory requirements.  There were 75 separate regulatory requirements for which Asmark Institute provided assistance.  Asmark Institute continued to provide the same regulatory compliance services as Asmark, Inc.  Its customer base was larger than that of Asmark, Inc., because the trade associations promoted its services to their members.

6.    Membership

Asmark Institute had five categories of membership, as follows:

(1) Charter member.  A Charter member was an entity or individual that had contracted to purchase services from Asmark, Inc., or Asmark Institute before the date that Asmark Institute began operations.  Apparently, this date was considered to be July 21, 2005.  Asmark Institute's website stated:  "Clients of Asmark on record on July 21, 2005 are considered charter members of the new Asmark Institute."

(2)  Regular member.  A Regular member was any member that was admitted to Asmark Institute after the date Asmark Institute was created and that did not fit into the other categories of membership.

(3) <u>Association member</u>.  An Association member was "any entity or individual of a state or national industry or trade association or organization" who was not otherwise eligible for membership.

(4) <u>Government member</u>.  A Government member was a department, authority, or agency of a federal, state, or local government.

(5) <u>Educational member</u>.  An Educational member was a domestic not-for-profit institution of higher learning that was not otherwise eligible for membership.

The benefits received by each class of member, and the fees paid by each, were as follows:

<u>Educational and Government members</u>.  No fees were assessed. The benefits to such members included basic communications such as a newsletter, a service called "safety matters", Ask ERICA, and updates.  Ask ERICA is a service that is described later in this opinion.  We find that the benefits provided to the Educational and Government members were relatively insignificant.

<u>Association members</u>.  No fees were assessed.  The benefits offered included basic communications and the SABRS service package (a package of services described below).

<u>Regular and Charter Members</u>.  The fees for Regular and Charter members were set forth in a "Price List & Distribution Schedule".  The Price List & Distribution Schedule set forth the

following service packages and prices for Regular and Charter members:

### Price List & Distribution Schedule

| Service Package | Price per Facility |
|---|---|
| Compass package | $1,480 (for client with 1-99 locations) |
| Lighthouse package (no annual travel by state association) | $2,180 (for client with 1-99 locations) |
| Lighthouse package (requiring annual travel by state association) | $2,480 (for client with 1-99 locations) |

As of March 13, 2006, Asmark Institute had 976 Charter members, 102 Regular members, 9 Association members, no Government members, and no Educational members.[4]  It anticipated that the number of Charter members would be unchanged, the number of Regular members would increase to 1,198, the number of Government members would increase to 150, and the number of Educational members would increase to 250.

7.   The SABRS Service Package, the Compass Service Package, and the Lighthouse Package

Asmark Institute sold some of its services in bundled packages.  There were three types of service packages, described by Asmark Institute's marketing brochures as:

- "SABRS™--Cut through the regulatory red tape!"

_____

[4]The parties agree that Asmark Institute had 976 Charter members.  Its website lists only 211 Charter members.  The parties do not explain the discrepancy.

- "Compass™--Helping you find your way!"

- "Lighthouse™--Navigate the regulations!"

We refer to the three service packages as the SABRS package, the Compass package, and the Lighthouse package.

Of the three service packages, the one with the lowest level of service was the SABRS package. It appears that if a trade association was a member of Asmark Institute, the trade association received the SABRS service package, and its members received indirect benefits through the SABRS service package. The trade association was not charged a fee. The trade association's members were not charged either, unless they purchased an additional service. Asmark Institute provided partial access to its computer system to the trade association, which could then use the computer system to provide services to the trade association's members. The trade association and its members could also place orders for materials for a fee from Asmark Institute. The trade association's members could also order specialized services from Asmark Institute, which would split the fee for the services with the trade association.

The next type of service package was the Compass package. It appears that the Compass package was offered to any farm retailer who chose the package. All retailers who chose the package were considered Regular or Charter members of Asmark Institute. If the retailer was a member of a trade association

that itself was an Association member, then the trade association participated in the delivery of services to the retailer and shared in the revenue from the services.

Asmark Institute did not charge the Association member for the Compass package. It charged the Regular or Charter member who chose this package $1,480 per facility per year. Of this $1,480 fee, $280 was shared with the Association member to which the Regular or Charter member belonged. Asmark Institute provided training to the trade association, which in turn provided services to the trade association's members. If the retailer commissioned specialized work or products, Asmark Institute split the fee with the trade association.

The next type of service package was the Lighthouse package. It appears that the Lighthouse package was a service offered to any farm retailer who chose the package. All retailers who chose the package were considered Regular or Charter members of Asmark Institute. If the retailer was a member of a trade association that itself was an Association member, then that trade association participated in the delivery of services to the retailer and shared in the revenue from the services.

Asmark Institute did not charge the Association members for the Lighthouse service package. It charged its Regular or Charter members who chose the package $2,480 per facility per year. Of this charge, $880 was shared with the Association

member to which the Charter member or Regular member belonged.
Alternatively, if no on-site visit was required, the charge to
the Regular or Charter member was $2,180 per manned facility, and
Asmark Institute paid $580 of the fee to the trade association.
Work duties were split between Asmark Institute and the trade
association.  A substantial portion of the work was done by
Asmark Institute.  The Lighthouse package was roughly comparable
to the services that Asmark, Inc., had provided to its clients.

8.  Specific Services.

On a list that it gave the IRS of its major activities and
benefits, Asmark Institute identified six particular services:
SVA, Ask ERICA, NTIP, myRMP, IURA, and SPCC.  We describe each of
these services, the fee for each service, and whether the service
was offered through the three service packages.

a.  Security Vulnerability Assessment (SVA)

Asmark Institute offered a service called the security
vulnerability assessment, or SVA.  What follows is a description
of the SVA.  Many farm retailers sell ammonium nitrate and
anhydrous ammonia for use as fertilizer.  Ammonium nitrate can
also be used to make bombs.  Anhydrous ammonia can also be used
to make illegal drugs.  The SVA identified the ways in which a
farm retailer could prevent terrorists and criminals from
obtaining these chemicals.  SVA was used by retailers to satisfy
requirements imposed by the Department of Homeland Security.

The SVA service was offered through all three service packages. For retailers who were not Regular or Charter members but who belonged to an association that was an Association member, the SVA service was provided through the SABRS service package. For these retailers, the fee for the SVA program was $75 to $300. Asmark Institute would share 40 percent of the fee with the association. The farm retailer could not directly access the Asmark Institute website. For farm retailers who had enrolled in the Compass service package, the extra fee for the SVA service was $27.50. None of the fee was apparently shared with the retailer's association. For farm retailers who had enrolled in the Lighthouse package, the fee for the SVA service was $27.50. Apparently, none of the fee was shared with the association. The relative duties of the retailer, the association, and Asmark Institute depended on the type of service package.

Some farm retailers were not Regular or Charter members and were not members of an association that was a member of Asmark Institute. Such retailers did not participate in any of the three service packages. However, they were eligible to purchase the SVA service.

b. <u>Nurse Tank Inspection Program (NTIP)</u>

Asmark Institute offered a service called the Nurse Tank Inspection Program, or NTIP. A nurse tank is a steel tank used

to transport anhydrous ammonia, pressurized so that it is in liquid form.  See 49 C.F.R. sec. 173.315(m) (2009) (defining nurse tank).  Federal regulations require an identification plate to be attached to each nurse tank in operation.  Id. sec. 173.315(m)(1).  Not infrequently, an identification plate falls off a nurse tank.  In 2004, the Department of Transportation created an alternative regulatory scheme that allowed nurse tanks to operate after losing their identification plates.  75 Fed. Reg. 42367 (July 21, 2010) (describing special permit SP 13554, in effect since 2004).  Asmark Institute administered a national registry of nurse tanks governed by this alternative regulatory scheme.  This registry is referred to as the Nurse Tank Inspection Program.  In order to qualify for the alternative regulatory scheme, a retailer had to participate in the NTIP program and pay $25.  The alternative regulatory scheme came about through the lobbying efforts of the Fertilizer Institute, an organization which then shared with Asmark Institute a role in administering the NTIP.

The NTIP program was offered through all three service packages.  Some farm retailers received the NTIP service through the SABRS service package.  These retailers received the NTIP service at "cost".  We infer from the record that the cost was $25.  For farm retailers who received the NTIP service through

the Compass or Lighthouse service package, the NTIP service was also offered at "cost". Some farm retailers were not Regular or Charter members and were not members of an association that was itself a member of Asmark Institute. Such retailers were eligible to purchase NTIP.

The NTIP program was not offered to the clients of Asmark, Inc. We infer, therefore, that NTIP was a new program started by Asmark Institute.

c. myRMP

Another service offered by Asmark Institute was myRMP, a web-based application for the preparation and maintenance of a risk management plan. A risk management plan is used by a facility that stores anhydrous ammonia to take steps to prevent the uncontrolled release of the gas. Such releases are dangerous to people and destructive of the ozone layer. Another purpose of the myRMP program was, in the words of Asmark Institute, to "address uneven enforcement by the various regions of EPA". The price of myRMP and the type of service depended upon the service package. Some farm retailers received the myRMP service through the SABRS service package. They were retailers who were members of Association members of Asmark Institute but who were not Regular or Charter members. For these retailers, the fee for the myRMP service was $500. Of the $500 fee, the association received 30 percent. The retailer did not have access to the

Asmark Institute website directly.  For farm retailers who had enrolled in the Compass service package, the price of the myRMP service was $300, with the association receiving 30 percent of the price.  The retailer had access to the website.  For retailers who had enrolled in the Lighthouse package, the fee for the myRMP service was $88.  Apparently, none of this fee was shared with the association.  The retailer had access to the website.

Some farm retailers were not Regular or Charter members and were not members of an association that was itself a member of Asmark Institute.  Such retailers were eligible to purchase myRMP.

In 2007, the EPA awarded a $20,000 annual grant to Asmark Institute for its work on the myRMP program.

The myRMP program was not offered to the clients of Asmark, Inc.  We infer, therefore, that myRMP was a new program started by Asmark Institute.

d.    Inventory Update Rule Amendment (IURA) Program

The Inventory Update Rule Amendment program, or IURA, was a web-based tool for making reports to the EPA regarding the movement of imported fertilizers within the United States.  The record does not indicate that IURA was offered through any of the three service packages (i.e. SABRS, Compass, Lighthouse).  The IURA service required the payment of a fee.

The IURA program was not offered to the clients of Asmark, Inc.  We infer, therefore, that the IURA program was a new program started by Asmark Institute.

e.   SPCC

Asmark Institute offered SPCC, a web-based tool for preparing "Spill Prevention Control and Countermeasure" plans for farm centers.  SPCC was not offered through the SABRS service package.  SPCC was not offered through the Compass service package.  SPCC was offered through the Lighthouse service package for a fee.  The record does not reveal how or under what circumstances the SPCC was offered to retailers other than through the Lighthouse program.

The SPCC program was not offered to the clients of Asmark, Inc.  We infer, therefore, that SPCC was a new service offered by Asmark Institute.

f.   Ask ERICA

Asmark Institute offered a service called "Ask ERICA".  Ask ERICA was a repository of agency interpretations from DOT, EPA, and OSHA that were important to agribusiness.  "ERICA" is the acronym for Electronic Repository of Interpretations Critical to Agriculture.

The Ask ERICA service was provided for no charge to the Association members.  It was also provided at no additional charge to Regular and Charter members.  The record is scanty on

the terms by which Ask ERICA was provided to retailers who were not Regular and Charter members.  Asmark Institute made a vague representation to the IRS that it "administers and/or acts as a resource" for Ask ERICA, and that Ask ERICA was "available to the entire industry (nonmembers and members)".  This representation is ambiguous.  Thus, the record does not reveal whether Ask ERICA was offered to nonmembers for a fee.

The Ask Erica program was not offered to the clients of Asmark, Inc.  We infer, therefore, that Ask Erica was a new program started by Asmark Institute.

9.    Services to Section 501(c)(3) Organizations.

The IRS contends that there is no evidence in the record that any of Asmark Institute's clients are section 501(c)(3) organizations.  Asmark Institute objects to such a finding of fact.  It claims that a document in the record, "List of Federal, State and County Government Entities Served by the Asmark Institute", demonstrates that it served section 501(c)(3) organizations.  But the document to which Asmark Institute refers appears to be a list of governmental units, not section 501(c)(3) organizations.  We find that there is no evidence in the record that any of Asmark Institute's clients are section 501(c)(3) organizations.

10.  Procedural History

As noted, Asmark Institute applied to the IRS for recognition of tax-exempt status in June 2005.  The IRS Tax Exempt and Government Entities (TEGE) Division requested additional information from Asmark Institute on March 1, 2006.  Asmark Institute supplied additional information on March 20, 2006.  In November 2006, the IRS TEGE Division denied Asmark Institute's request for recognition of exempt status.  In January 2007, Asmark Institute appealed the denial to the IRS Appeals Office.  To support its appeal, Asmark Institute sent the IRS Appeals Office 11 additional documents.  In November 2007, the IRS Appeals Office determined that Asmark Institute was not exempt under section 501(c)(3).  Asmark Institute filed a petition for declaratory judgment with the Tax Court.  Asmark Institute and the IRS stipulated that the administrative record comprised 84 exhibits.  At the request of the parties, the case was submitted without trial under Rule 122.

## Discussion

Section 7428(a) confers jurisdiction on the Tax Court to "make a declaration" with respect to the "initial qualification" of an organization seeking tax-exempt status under section 501(c)(3).  Rule 217(a) provides that such an action for declaratory judgment shall be resolved on the basis of the administrative record.  Furthermore, Rule 217(b)(1) provides that

"the Court's decision will be based upon the assumption that the facts as represented in the administrative record as so stipulated or so certified are true and upon any additional facts as found by the Court if the Court deems that a trial is necessary."

Neither party expresses a view about who has the burden of proof in this proceeding. As explained below, we find that a preponderance of the evidence shows that Asmark Institute did not satisfy the requirements of section 501(c)(3). Therefore, even if the IRS has the burden of proof, the IRS has shown that Asmark Institute was not entitled to tax-exempt status. Neither party expresses a view as to the standard by which we should review the IRS's denial of recognition of tax-exempt status. Even if the appropriate standard of review is de novo, i.e. even if we gave no deference to the determination of the IRS, we believe the determination should be sustained.

To be exempt from income tax under section 501(c)(3), an organization must be "operated exclusively" for exempt purposes. Exempt purposes include a "charitable" purpose. Here is the standard for determining whether Asmark Institute meets the test:

> Under the operational test * * * the critical inquiry
> is whether * * * [an organization's] primary purpose
> for engaging in its * * * activity is an exempt
> purpose, or whether its primary purpose is the
> nonexempt one of operating a commercial business
> producing net profits * * *

B.S.W. Group, Inc., v. Commissioner, 70 T.C. 352, 356-357 (1978). Asmark Institute argues that its activities served the charitable purpose of "assisting agricultural retail centers to comply with the myriad requirements of Federal and state laws designed to protect the public." It gives three examples of how it assisted farm centers with legal compliance: (1) its security vulnerability assessment program (SVA), (2) its risk management program (myRMP), and (3) its nurse tank inspection program (NTIP). In addition, Asmark Institute argues that it provided free services. As evidence of the free services, it points to the following five items:

- The attorney for Asmark Institute wrote a letter to the IRS Appeals Office protesting the decision of the IRS TEGE Division. The letter stated that "The compliance tool is available without charge to the public."

- The same letter stated that "The database has been turned over to an unrelated company to administer and maintain and which has agreed to make information therefrom available to the public."

- The SABRS service package provided free information to members of trade associations who have signed an affiliation agreement.

- The SABRS service package provided free posters to trade associations.

•For no charge, Asmark Institute's president and CEO, Allen C. Summers, testified at a hearing on "Preventing Terrorist Attacks on America's Chemical Plants" before the House Committee on Homeland Security, Subcommittee on Economic Security Infrastructure Protection and Cybersecurity, on June 15, 2005.

Before analyzing Asmark Institute's arguments, we will summarize the IRS's position that Asmark Institute conducted commercial activity rather than charitable activity. First, the IRS argues that Asmark competed with commercial firms. Second, the IRS argues that providing services to agribusiness is not an inherently charitable activity. Third, the IRS argues that Asmark Institute offered the same services, charged the same prices, and employed the same workers as its for-profit predecessor, Asmark, Inc. Fourth, the IRS argues that the Asmark Institute's commercial nature is evinced by the fact that its clients were for-profit businesses. Fifth, the IRS observes that Asmark Institute's relationships with trade associations were designed to increase its client base. Sixth, the IRS argues that Asmark did not educate the public because its educational and compliance materials were available only for a fee.

As we will explain, we agree with the IRS that Asmark Institute's operations were commercial rather than charitable. Its operations consisted mainly of compliance services provided

for a fee.  Therefore, we will first discuss whether the providing of compliance services for a fee was charitable.  We will then discuss the free services provided by Asmark Institute.

Asmark Institute argues that by providing compliance services to farm retailers for a fee, it generated public benefits.  For example, one service was to identify ways for its members to comply with regulations designed to prevent the uncontrolled release of anhydrous ammonia gas.  But the public benefit of preventing the release of ammonia into the air is no different from the benefits of complying with many other legal requirements.  Many laws are supposed to produce benefits to the public.  Improving compliance with these laws should therefore produce public benefits.  This is not sufficient to constitute a charitable operation.  Were it otherwise, firms that assist their clients in complying with the laws on a fee-for-service basis could claim exemption from income tax.

Besides its paid services, Asmark Institute offered free services.  In considering whether the free services provided by Asmark require us to characterize its operations as charitable instead of commercial, we first observe that the free services it provided were relatively small in relation to all of its services.  Of three major services provided by Asmark--the Security Vulnerability Assessment, the Nurse Tank Inspection Program, and myRMP--none was free.  Asmark Institute identified

five free services in its brief, but these do not tilt the scale. The first free service was a "compliance tool", as it was vaguely described in the protest letter by Asmark Institute's attorney. We do not know what the "compliance tool" was, how it was administered, and who it benefited. The second free service was identified as "the database" in the same protest letter. Similarly, we do not know specific information about "the database", how it was administered, and who it benefited.

The third free service identified by Asmark Institute was the information that it made available to members of the trade associations who participated in the SABRS service package. It is obvious that this service was part of Asmark Institute's campaign to market itself to members of the trade associations. Asmark Institute hoped to convince these members to pay it for services. Thus, its distribution of free information to the associations does not demonstrate that Asmark operated as a charity.

The fourth free service identified by Asmark Institute was its distribution of free posters to trade associations as part of the SABRS service package. However, the portions of the administrative record cited by Asmark Institute show that it charged a fee for these posters. The posters were not in fact free.

Fifth, Asmark Institute argues that it provided a free service to the Congress when its president and CEO testified before a congressional committee. We have no reason to doubt that the testimony of Mr. Summers was beneficial to the committee. But we believe that the testimony also served private interests. As a publication of the Fertilizer Institute noted "Summers used his testimony to relay to the subcommittee the fertilizer industry's opposition to any legislation that mandates the use of inherently safer technologies (IST)." On balance, this testimony and the other free services provided by Asmark Institute (for example, the standard services it provided to Government members and Educational members, to whom it charged no membership fee) do not convince us that Asmark Institute was something other than a commercial provider of services.

Our conclusion that Asmark Institution's operations were commercial rather than charitable is fortified by the fact that Asmark Institute competed with commercial firms,[5] the fact that Asmark Institute continued the same operations as its for-profit predecessor (except for its expansion of its relationships with trade associations, a move designed to increase its base of fee-paying members), and the fact that its clients were for-profit

---

[5]The administrative record establishes that Asmark Institute took a more "hands-on" approach to compliance services than other service providers.

businesses that purchased Asmark Institute's services in order to minimize the costs of regulatory compliance.

In an additional attempt to explain why its operations were charitable, Asmark Institute argues that its operations lessened the burdens of government. According to section 1.501(c)(3)-1(d)(2), Income Tax Regs., one purpose that qualifies as a charitable purpose is the "lessening of the burdens of Government". An organization may be considered to lessen the burdens of government if a government unit (1) has accepted as its responsibility the activities conducted by the organization and (2) recognizes that the organization is acting on the government's behalf. Columbia Park & Recreation Association, Inc. v. Commissioner, 88 T.C. 1, 21 (1987), affd. without published opinion 838 F.2d 465 (4th Cir. 1988). Asmark Institute's activity is to assist farm retailers in complying with government regulations. The record does not show that a government agency has accepted responsibility for Asmark Institute's activity. Nor does the record show that Asmark Institute was acting on behalf of any government agency. There are various letters from government agencies expressing their appreciation for the efforts of Asmark Institute in improving compliance with regulations. There is also evidence that government agencies have expressed an interest in "working with" Asmark Institute. There is also some evidence that the EPA gave

Asmark Institute a $20,000 grant.  These documents do not establish that a government agency has accepted responsibility for Asmark Institute's activities, or that a government agency has recognized that Asmark Institute is acting on the agency's behalf.

We find that Asmark Institute was not operated exclusively for exempt purposes.  It therefore was not tax exempt.  We need not reach the IRS's additional argument that Asmark Institute was operated for the benefit of private interests.

<u>Decision will be entered</u>

<u>for respondent</u>.